LEONARDO M. RAPADAS
United States Attorney
KARON V. JOHNSON
Assistant U.S. Attorneys
Suite 500, Sirena Plaza
108 Hernan Cortez Avenue
Hagatna, Guam 96910
Telephone: (671) 472-7332/7283
Telecopier: (671) 472-7334

Attorneys for the United States of America

Kim.trial

**ORIGINAL**

**FILED**
DISTRICT COURT OF GUAM
NOV - 1 2006
MARY L.M. MORAN
CLERK OF COURT

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF GUAM

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>             Plaintiff,<br><br>vs.<br><br>DUH WAN KIM,<br><br>             Defendant. | CRIMINAL CASE NO. 06-00036<br><br>GOVERNMENT'S TRIAL MEMORANDUM AND RESPONSE TO DEFENDANT'S MOTION IN LIMINE |

The defendant is charged with attempting to possess .5 kilos of rock salt, which he believed to be ice. Following is a brief summary of the government's case in chief.

Glenn Moore, the DEA Special Agent, Seoul Country Office, contacted the Guam residency with information that Korean law enforcement officials had uncovered a conspiracy to import a half-kilo of methamphetamine hydrochloride (ice) into Guam. Moore advised that the Korean authorities had an informant planted in a drug ring, one Sun Ho Park. Mr. Park had reported that he had been asked by one of the principals to find couriers to carry a load of ice to Guam. The Korea police provided two people (friends or relatives of Korean officers) who would pose as a honeymoon couple, and the informant advised his principal that he had secured the couriers. According to Moore, the informant said that defendant was to accompany the couriers to Guam, acting as a counter-intelligence agent, and then obtain the suitcase from them as soon as they walked out of the airport.

DEA was advised that the plan was to have the couriers check in the suitcase then board the plane. The Korean authorities planned to search the suitcase and seize the ice: they would not let it out of the country. Thus, the DEA Guam office determined to substitute a fake substance for the ice once the suitcase reached Guam, and to attempt a controlled delivery to defendant, in the hopes he would lead them to the ring's Guam distributor. It was important, however, that the delivery take place in a secure location, under their control. Thus, a hand-off outside the airport was unacceptable. DEA S/A Ken Bowman determined that agents would meet the plane, but take the couriers to a hotel, so that they could set up video and audio equipment in the room, and the defendant would have to come there to pick up the suitcase.

In the early evening of Wednesday, August 23, 2006, the DEA Guam office was advised by S/A Moore that the operation had gone well at the Korean end. The couriers/honeymooners had received the suitcase, it had been seized as soon as they checked in, and 536 grams of ice had been found secreted in the lining. Korean officials had seized the ice, but put the suitcase back with the plane's other luggage. Defendant and the couriers boarded the plane, along with S/A Moore and several Korean law enforcement officials. S/A Moore e-mailed photos of the defendant and the couriers, and of the suitcase and the ice actually seized from it, so that Guam Customs officers could duplicate the packaging and put sham into the suitcase in the same manner as the ice had been secured.

At about 11 p.m., about 25 federal and local agents assembled at the DEA office to be briefed on the operation, and assigned their respective roles. Customs Officer Chris Sablan had received the photos from Korea. After the meeting he assembled his equipment and received more rock salt from S/A Bowman.

The flight landed about 1:30 a.m. S/A Bowman asked Guam Customs officers to send defendant to secondary inspection until the couriers/honeymooners had left the airport. They were transported to the Holiday Inn Resort, and defendant was released from secondary. When he walked out he used his cell phone, then waited by the entrance. Within 10 minutes S/A Bowman observed a green Mazda pick up the defendant. The tint was such that S/A Bowman could never see the driver. He ran a registration check on the car, but it came back to a PO Box,

and a name he believes to be fake, because a subsequent record check determined that no driver's license had been issued to anyone by that name.

S/A Bowman and Task Force Agent Eugene McDonald followed the car to the Pia Marine, where the defendant got out and the car drove off. They staked out the building until about 8:30 a.m., when they observed the same car pick up the defendant and head south on Marine Drive. The car was ultimately spotted at the Royal Orchid Hotel. S/A Bowman verified that defendant had check in there, and proceeded to stake out the hotel

In the meantime, the couriers had been installed in Room 843 at the Holiday Inn. Task Force Agent Marvin Desamito set up surveillance and support in the next room. He installed a recording system in the courier's room and waited. Customs Officer Chris Sablan created a package of ice of the same weight and appearance as depicted in the photos from Korea, placed it in the same location in the suitcase, and hot-glued the seams together. At 5:17 p.m., the couriers/honeymooners received a telephone call from defendant, who said he was in the hotel. When defendant entered Room 843, Desamito activated the recording system from the other room.

Defendant was arrested when he attempted to leave with the suitcase. After being advised of his rights, he was interviewed by DEA Foreign Service National Kyong Sun Lim. He told Mr. Lim that two days before, Sun Ho Park had asked him to travel to Guam to meet with two couriers who were carrying a large quantity of methamphetamine. Defendant said Park had given him round-trip tickets to Guam and travel funds. Defendant said that once he arrived on Guam he was to get the methamphetamine from the couriers, which is why he had come to the Holiday Inn. He said he intended to hold the methamphetamine until Park arrived on Guam, then deliver it to him. Upon being shown photographs of the principals of the ring, defendant asked for an attorney and the interview was terminated.

## DEFENDANT'S MOTION IN LIMINE

Defendant has filed a motion in limine, seeking to limit testimony concerning the information the Guam DEA office had received from S/A Glenn Moore. His citation to Crawford v. Washington, 124 U.S. 1356 (2004), however, is not on point. Crawford concerned

"testimonial" statements, i.e., out-of-court statements offered at trial for the truth of the matter asserted, as evidence concerning the defendant's guilt. By "testimonial" statements, the Court meant statements made in a "testimonial" setting, in this case while the wife was in custody and being interrogated concerning the defendant's conduct. Her statements were that of a witness, one who "bear[s] testimony." Id. at 1364. They were elicited for the purpose of establishing his guilt. The Crawford court held that such statements, whether inherently reliable or not, were clearly in violation of the defendant's Sixth Amendment right to confront the witness against him, in this case, his wife.

Federal Rule of Evidence 801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." FRE 802 provides that hearsay is not admissible, absent certain exceptions set forth in FRE 803, 804 and 805.

The criminal digests lists hundreds of cases concerning situations where out-of-court statements are admitted to establish state of mind, course of conduct, and a myriad of other matters. As explained in United States v. Parry, 649 F.2d 292 (9th Cir. 1981), the reason hearsay is excluded is that "when an out-of-court statement is offered as a testimonial assertion of the truth of the matter stated, we are vitally interested in the reliability of the out-of-court declarant. ... Implicit in both the definition and justification for the rule, however, is the recognition that whenever an out-of-court statement is offered for some purpose other than to prove the truth of the matter asserted, the value of the statement does not rest upon the declarant's credibility and, therefore, is not subject to attack as hearsay." Id. at 294-95. In Parry, for example, the defendant was charged with distributing drugs for two undercover agents. His defense was that he knew they were agents all along, and was acting in good faith to help them apprehend drug dealers. His mother attempted to testify that Parry told her the person telephoning her home was a narcotics agent and that he was working as an agent. The Ninth Circuit held that the district erred in not allowing her testimony. Defendant's statement had not been offered to prove that the

-2-

caller was a narcotics agent, but to prove his state of mind, that he had knowledge of the agent's identity while working with him.

The evidence the government will offer in this case is not hearsay: Statements concerning the information being provided by Korean investigators is not being offered to prove the truth of the matter asserted, but rather to explain why the DEA did what it did. Absent this testimony, the government's evidence would be inexplicable. The jury would learn that the DEA briefed some 25 officers, but not what the officers were told. There would be no explanation for why the DEA met this flight from Korea, why they caused defendant to be delayed by a secondary inspection, why they installed two Koreans at the Holiday Inn, how they identified these two particular Koreans, why S/A Bowman knew what defendant looked like, why he tailed the defendant to the Pia Marine and later to the Royal Orchard, why Customs agents vacuum-sealed a half-kilo of rock salt and hid it in the lining of a suitcase, or why DEA mounted a camera in the clock radio of Room 838. The government's evidence would be incomprehensible.

Respectfully submitted this 31st day of October, 2006.

LEONARDO M. RAPADAS
United States Attorney
Districts of Guam and NMI

By: /s/ Karon V. Johnson
KARON V. JOHNSON
Assistant United States Attorney