ORIGINAL

duhkimrule29

LEONARDO M. RAPADAS
United States Attorney
KARON V. JOHNSON
Assistant U.S. Attorney
Suite 500, Sirena Plaza
108 Hernan Cortez Avenue
Hagatna, Guam 96910
Telephone: (671) 472-7332
Telecopier: (671) 472-7334

Attorneys for the United States of America

FILED
DISTRICT COURT OF GUAM
NOV 22 2006
MARY L.M. MORAN
CLERK OF COURT

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF GUAM

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　Plaintiff,<br><br>vs.<br><br>DUH WAN KIM,<br><br>　　　　　　Defendant. | CRIMINAL CASE NO. 06-00036<br><br>GOVERNMENT'S RESPONSE TO DEFENDANT'S RULE 29 MOTION |

Defendant correctly states the standard of review. There is sufficient evidence to support a conviction if, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979).

Defendant misstates one of the elements, however, when he continues to insist that the government had to prove the amount of ice (if it was ice) which was seized by Korean authorities in Seoul. To the contrary, defendant was charged with what he actually attempted to possess *on Guam*. His conduct *on Guam* is what gives this court jurisdiction to try this offense. *On Guam* he physically possessed with intent to distribute 500 grams of rock salt. We know it was 500 grams because Officer Sablan testified that this was the amount he weighed and packaged. The

1

only reason defendant was charged with Attempted Possession with Intent to Distribute is that he possessed rock salt, not methamphetamine. As discussed in the government's memorandum on the defense of impossibility, the issue was, What was defendant's undisputed objective as he stood at the door with a suitcase containing 500 grams of rock salt? His undisputed objective was, to distribute what was in that suitcase, a substance weighing 500 grams. If defendant is correct, controlled deliveries could never be prosecuted unless there had been real drugs at some point during the course of events. This is not the law, however.

There was no dispute that defendant knew the suitcase contained drugs. Setting aside the circumstantial evidence (his presence in the hotel room of two total strangers to receive a suitcase which did not belong to him), the couriers themselves told him it contained drugs long before he attempted to carry it out the door. He admitted during the interview that he knew the suitcase contained drugs, that his purpose for coming to the hotel had been to pick up the suitcase, and that he intended to deliver it to his friend Park. The sole issue for the jury was whether defendant believed that the particular type of drug in the suitcase was ice. Proof of one's state of mind is generally by circumstantial evidence. The proof in cases of this nature is almost always through testimony of law enforcement officials as to the standard operating procedure of drug trafficking organizations, and evidence concerning the degree to which the defendant fits the profile of a drug trafficker.

The government's case was straightforward: 1) all drug trafficking rings are structured and operate in the same way; 2) defendant was a member of a drug trafficking ring because he acted exactly as such persons do; and 3) members of such rings, who make their living dealing in illegal drugs, necessarily know what they are selling, because this is their business. In addition to this logical chain of deductions, there was an additional factor in this case: for the last 30 years, the only controlled substance coming out of Korea is ice. If defendant is Korean, and is a member of a Korean drug trafficking ring, necessarily he knows he is dealing ice.

2

The main thrust of Agent Bowman's and FSN Lim's testimony was to establish how such organizations, and in particular Korean drug rings, operate. Korea no longer manufactures ice. Presently, Korean kingpins order it from producers in China, the Philippines or Taiwan. They send trusted cohorts to these countries to receive the product and carry it into Korea, where the ice is repackaged and distributed to "target" markets by other members of the ring. These facilitators ensure that the product gets to the foreign distributor. They do this by hiring couriers to carry it to its destination, and follow the couriers to ensure they do not steal the product or get caught. Once they are satisfied the couriers have not been compromised, they retrieve it from the couriers and deliver the load to its appointed distributor. These Korean drug dealers are a close band of trusted confederates who operate jointly to accomplish a common goal: the distribution of methamphetamine for profit.

The evidence was also undisputed that drug traffickers know how law enforcement works, that if a courier is caught with the goods, law enforcement will attempt to arrange a controlled delivery to identify the drug dealer who is to receive the load. For this reason, the couriers never know the identity of the person who is to receive it. They are instructed to go to a particular place, or wait in a particular place, for "someone" to contact them. If the gang member believes they have been compromised, the contact never occurs. Necessarily, such a person must be a trusted member of the organization, because he knows the identity of the person who is to receive the shipment.

The jury was entitled to find that members of such an organization necessarily know they kind of drug they're distributing, because its their business. No one would argue that a member of the Crips or Bloods who is running loads of crack to designated "crack houses" does not know what he's carrying. The same principle applies here.

Thus, the only issue before the jury was whether defendant was a member of a Korean drug trafficking organization, or whether he was a mere courier, one of the throw-away people used by such organizations to take the risk, and suffer the consequences, of getting caught. The

undisputed evidence was that defendant traveled on the same plane as the couriers, that he expected to meet them outside the airport, and that when he came outside and found they had disappeared, he had to contact other members of the organization in Korea to learn where they were. The jury knew defendant was not a low-level courier, because he did not carry the suitcase through Customs. They knew he was in league with the ring-leaders in Korea, because the only way he could have learned where the couriers were staying was to contact his confederates in Korea. The jury knew he was the one designated to receive the load from the couriers, because he went to the Holiday Inn Resort for that purpose. And they knew that he was familiar with the way law enforcement works. The video tape, and his questions to the couriers, reveal a man who was thoroughly familiar with how the "FBI" operates, and who clearly suspected a trap because the couriers had not follow the prearranged game plan. His evident suspicions, and repeated questioning of how and why they left the airport, and what they knew about the contents of the bag, reflects the sophisticated knowledge of a trusted member of the organization. Given all the circumstances, it would be incredible to think that he did not know the nature of the drugs in the suitcase.

RESPECTFULLY SUBMITTED this __21st__ day of November 2006.

LEONARDO M. RAPADAS
United States Attorney
Districts of Guam and NMI

By: _____
KARON V. JOHNSON
Assistant U.S. Attorney

4